# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 04-325

JULIE GUIDRY, ET AL.

VERSUS

COREGIS INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NUMBER 98-4848
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

### BILLIE COLOMBARO WOODARD
### JUDGE

**********

Court composed of Chief Judge Ulysses G. Thibodeaux, Billie Colombaro Woodard, and Oswald A. Decuir, Judges.

**AFFIRMED IN PART AS AMENDED, REVERSED IN PART, AND RENDERED.**

**Woodard, J., concurs in part and assigns written reasons.**

Larry Lane Roy
Preis, Kraft & Roy
Post Office Drawer 94-C
Lafayette, Louisiana 70509
(337) 237-6062
COUNSEL FOR
DEFENDANT/APPELLANT:
    James Daniels
    Ringuet, Daniels & Collier

Gregory Paul Allen Marceaux
Marceaux Law Firm
1800 Ryan Street, #101
Lake Charles, Louisiana 70601
(337) 310-2233
COUNSEL FOR
PLAINTIFF/APPELLANT:
    Julie Guidry

Gus A. Fritchie
Irwin Fritchie Urquhart & Moore
400 Poydras Street, Suite 2700
New Orleans, Louisiana 70130
(504) 310-2100
COUNSEL FOR
DEFENDANT/APPELLANT:
    Lawrence D. Wiedemann
    Wiedemann & Wiedemann

James Huey Gibson
Allen & Gooch
Post Office Box 3768
Lafayette, Louisiana 70502-3768
(337) 291-1301
COUNSEL FOR
DEFENDANT/APPELLANT:
    Coregis Ins. Co.

WOODARD, Judge.

Both the Plaintiffs and Defendants appeal the trial court's judgment in this legal malpractice suit. We reverse the damages awarded to Randi Guidry because she is not a proper party to recover wrongful death or survival damages. We vacate the trial court's JNOV, reinstate the jury's verdict, amend its judgment to increase the quantum of damages for pain and suffering, and render.

\* \* \* \* \*

This appeal arises from Ms. Julie Guidry's legal malpractice claim against two attorneys, Mr. James L. Daniels and Mr. Lawrence D. Wiedemann, for allowing her potential cause of action for the wrongful death of her husband, Melvin Guidry, to prescribe. The underlying action arose when her husband died after being electrocuted in the course and scope of his employment as a billboard and sign repairman for Signko, Inc. (Signko). On June 23, 1997, Signko sent him to the Lucky Longhorn Truckstop (Lucky) to repair a "Chevron" sign. After he arrived, Lucky's manager, Mr. James William Hayes, asked him to work on some of the other signs, as well. To access them, Melvin utilized a Sponco SL-55 aerial ladder, a ladder attached to a truck that has a bucket at the end to hold the operator. While working on the signs, he contacted with some overhead power lines, electrocuting him and throwing him to the ground. He died from the injuries a few hours after the accident.

Julie retained Mr. Daniels to pursue her claims for his death. Daniels referred her case to Mr. Weidemann, retaining an interest in any potential recovery. However, neither attorney filed her suit within one year of Melvin's death, allowing her claim to prescribe. Consequently, she filed a legal malpractice action against the two attorneys, on her own behalf and on behalf of her two daughters, both minors at the time she filed suit. She alleged that the attorneys' negligence prevented her from recovering against several defendants who shared responsibility for her husband's death. She also prayed for damages associated with the legal malpractice.

1

Aside from distress resulting from the legal malpractice, itself, the plaintiffs' damages in a legal malpractice suit are determined by the damages, if any, they would have received had they prevailed in the underlying lawsuit.[1] Accordingly, in order to determine whether the attorneys' malpractice caused her and her daughters any damages, the jury had to determine whether and how much they would have recovered in the underlying suit.[2] Essentially, the jury in the legal malpractice suit had to "engage in a pretend exercise of measuring damages based on events that never in reality occurred or can occur,"[3] because the malpractice foreclosed their opportunity to pursue their underlying claims against the actual persons allegedly responsible for Melvin's death.[4]

The attorneys asserted that they would not have recovered any damages in the underlying suit because Melvin and his employer were solely at fault for the accident; any damage awards would have been reduced by his own comparative negligence.[5] Additionally, because the Louisiana Workers' Compensation Act is the exclusive remedy for any potential claims against Melvin's employer, Signko, the Plaintiffs could not have recovered the damages associated with Signko's fault in the underlying wrongful death action. Rather, the Office of Workers' Compensation has jurisdiction over the Plaintiffs' potential claim against Signko.[6] Furthermore, in the instant case, the Plaintiffs reached a settlement with Signko under the workers' compensation laws while their suit against the two attorneys was pending in the trial court.

Notwithstanding the Plaintiffs' inability to recover from Signko in their underlying wrongful death action, Louisiana's comparative fault law would have required a jury in such an action to consider Signko's fault.[7] Thus, if a jury had

---

[1]*Jenkins v. St. Paul Fire & Marine Ins. Co.*, 422 So.2d 1109 (La.1982).

[2]*Id.*

[3]*Smith v. State, Dep't of Health & Hospitals*, 95-38 (La. 6/25/96), 676 So.2d 543, 551 n. 9.

[4]*Smith*, 676 So.2d 543.

[5]*See* La.Civ.Code art. 2323(A).

[6]*See* La.R.S. 23:1032.

[7]*See* La.Civ.Code art. 2323.

2

allocated 100% of the fault to Melvin and/or to his employer, the Plaintiffs' ultimate recovery would have been zero. Therefore, the jury had to assess the fault of Melvin and his employer, as well as the fault of any potential defendants in the underlying case.

The Plaintiffs maintain that the potential defendants in the underlying case were Sponco Manufacturing/Phoenix Sales (Sponco), the ladder's manufacturer; Kojis & Sons, the company that sold the ladder to Signko; Lucky Longhorn Truck Stop, the accident site; and Entergy, the custodian of the power lines.

The jury allocated fault as follows:

| | | |
|---|---|---|
| Sponco Manufacturing | 5% | |
| Kojis & Sons, Inc. | 0% | |
| Entergy | 0% | |
| Signko, Inc. | 45% | |
| Melvin Guidry, Jr. | | 30% |
| Lucky Longhorn Truck Stop | 20% | |

The trial court granted Plaintiffs a Judgment Notwithstanding the Verdict (JNOV), reallocating Signko's fault percentage to Sponco, resulting in a 50% fault allocation to it and no fault to Signko.

The jury assessed Julie's damages in the underlying lawsuit at $750,000.00, her daughter, Randi's damages at $70,000.00, and her daughter, Mary's damages at $250,000.00. Additionally, it found that the Plaintiffs were entitled to $10,000.00 for Melvin's pre-death pain and suffering and $30,000.00 for their own mental distress associated with the Defendants' legal malpractice.

Finally, the jury found that the two attorneys, Mr. Lawrence and Mr. Weidemann, were equally responsible and assessed each with 50% of the fault.

Both the Plaintiffs and the Defendants appeal from the trial court's judgment. The Defendants allege multiple assignments of error. Concerning the fault allocation, they argue that the jury erred in allocating any fault to Lucky Longhorn or to Sponco and that it should have allocated all or substantially more fault to Melvin. They also assert that the trial court erred in granting the JNOV.

Additionally, the Defendants urge that the trial court committed evidentiary errors in admitting certain testimony that Plaintiffs' expert witnesses, Stephen Killingsworth and James Sobek, rendered; thus, they should not have to pay these two experts' witness fees.

They also claim the trial court erred in allowing Plaintiffs to recover medical and funeral expenses and in permitting Randi Guidry to recover any damages.

The Plaintiffs appeal the judgment, urging us to increase the amount of damages awarded for loss of support, pre-death pain and suffering, and mental distress resulting from the malpractice.

**ELEMENTS OF LEGAL MALPRACTICE CLAIM**

A legal malpractice plaintiff must establish a *prima facie* case by showing that she and the attorney had an attorney-client relationship and that her attorney was negligent.[8]  In the instant case, the two attorneys admit these two elements, establishing the Plaintiffs' *prima facie* case. Accordingly, the burden of production shifts to the Defendant attorneys, charging them to provide evidence sufficient to prove the Plaintiffs would not have prevailed on the underlying claim.[9]  The admittedly unnatural result is that the Defendant attorneys must advocate a position in extreme contrast to the position they previously agreed to advocate on their client's behalf.  However, the rule is justified because we must infer that their negligence caused the Plaintiffs' some loss, given the unlikelihood that they would have agreed to handle the claim unless it had some merit.[10] "Otherwise, there is an undue burden on an aggrieved client, who can prove negligence and causation of some damages, when he has been relegated to seeking relief by the only remedy available after his attorney's negligence precluded relief by means of the original claim."[11]

---

[8]*Jenkins*, 422 So.2d 1109.

[9]*Id.*

[10]*Id.*

[11]*Id*. at 1110.

4

**STANDARD OF REVIEW**

The Defendants' first two assignments of error involve liability determinations, one based on the duty-risk analysis and the other based on Louisiana Products Liability law. These determinations involve questions of, both, law and fact. The remaining alleged errors, which concern fault allocation, admissibility of certain testimony that expert witnesses gave, and awards of damages and costs, are all subject to the manifest error standard.[12]

**SPONCO'S FAULT**

The Defendants assert that the jury erred in finding Sponco liable for Melvin's death. Again, they had the burden of proving that the Plaintiffs could not have prevailed against Sponco.

Sponco is the manufacturer of the aerial ladder Melvin utilized when working on Lucky's signs. The Louisiana Products Liability Act (LPLA) establishes the exclusive theories for holding a manufacturer liable for damages their products cause.[13] It requires that: 1) a characteristic of the manufacturer's product renders it unreasonably dangerous; 2) the unreasonably dangerous characteristic proximately caused the Plaintiff's damages; and 3) the damages arose when employing the product in a reasonably anticipated use.[14] The LPLA enumerates limited means of demonstrating an unreasonably dangerous characteristic. Namely, a plaintiff must prove the product had inadequate warnings, failed to conform to the manufacturer's express warranties, or that the dangerous characteristic is inherent in the product's design, construction, or composition.[15] Thus, we turn first to a review of evidence concerning any unreasonably dangerous characteristics.

*Inadequate Warnings*

---

[12]*Clement v. Frey*, 95-1119 (La.1/16/96), 666 So.2d 607; *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993); *Cheairs v. State*, 03-680 (La.12/3/03), 861 So.2d 536.

[13]LA.R.S. 9:2800.52.

[14]La.R.S. 9:2800.54 (A).

[15]La.R.S. 9:2800.54 (B).

The Defendants presented evidence of adequate warnings. Specifically, Mr. Harold Sader, Sponco's President, testified that the manuals delivered to every customer, as well as the warning decals on the equipment, itself, admonish operators that the equipment is not to be used within ten feet of energized power lines. Mr. Brooks and Mr. Brady Kojis, a co-owner of Signko, verified his testimony.

### Failure to Conform to Express Warranties

Neither party presented evidence of any express warranties. Consequently, there was no evidence of failure to conform to any.

### Dangerous in Design

The LPLA requires several elements to show that a product is unreasonably dangerous in design. First, it requires that an alternative design existed when the manufacturer relinquished control of the product and that the alternative had the capacity to prevent the plaintiff's damages.[16] Additionally, it requires that "[t]he likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product."[17]

Furthermore, once these requirements are met, the manufacturer can still absolve itself of liability by showing that "it did not know and, in light of then-existing reasonably available scientific and technological knowledge, could not have known," either, of the dangerous characteristic or of the alternative design.[18] Alternatively, it can show that "in light of then-existing reasonably available scientific and technological knowledge," the alternative design was not feasible or economically practical.[19]

---

[16]La.R.S. 9:2800.56(1).

[17]La.R.S. 9:2800.56(2).

[18]La.R.S. 9:2800.59(A)(1) & (A)(2).

[19]La.R.S. 9:2800.59(A)(3).

The Defendants presented evidence that the ladder's design was not unreasonably dangerous. Specifically, Sponco's President testified that three manufacturers essentially dominated the manufacture of these ladders and that all had substantially the same design which had not changed in the last 20 years. The Plaintiffs countered with three alternative designs, allegedly capable of preventing Melvin's accident.

Mr. Stephen Killingsworth, Plaintiffs' expert witness in mechanical engineering and accident reconstruction, first, proposed a design which included an electric brake. While he admitted that he developed this alternative design only a couple of weeks before trial, he asserted that similar devices, such as cranes, employed an electric brake at the time of the SL-55 ladder's manufacture. Consequently, he urges that his design simply applies mechanical engineering principles that did exist at that time.

The Defendants refute his contention that his alternative design existed at the time of manufacture, urging that the LPLA requires that the design exist for the particular product in question; its existence for similar products is insufficient. Furthermore, they point out that even accepting the trial court's characterization that his design is not new but, rather, "an adaptation of an existing mode of addressing good mechanical forces that was in existence at the time of 1991," cranes are sufficiently distinguishable from aerial ladders because cranes lift or transport cargo rather than people. Mr. Killingsworth testified that some cranes have a basket that can be put on them for people to use. However, he did not deny that cranes primarily carry cargo while aerial ladders primarily carry people. This is a crucial factor, absent in the design of cranes, that manufacturers must consider when designing aerial ladders. Not only does it demonstrate the flaws in Mr. Killingsworth's argument that his design for this particular ladder existed at the time of manufacture, it is also of dire importance in the risk/utility analysis, as we detail below.

*Risk-Utility Analysis*

Mr. Killingsworth testified that the coast and drift on the SL-55 made it unreasonably dangerous and that the proposed brake would allow the operator to stop the ladder immediately, eliminating any coast or drift. He described "coast"

7

as "when you turn the power off it takes time for this electric motor to wind down, which means when I flip the switch on it and I swing [horizontally] this ladder over I can't stop that ladder immediately.  It is going to coast, coast to a stop," and "drift" as "the play that we've got in it [the gearing] so that when this unit is finally stopped, in other words, it is coasting and it stops, when I have a mass on the end of it, that ladder can still drift over and move because the mass on the end of it is still moving."  The Defendants' experts gave similar descriptions of coast and drift, although they explained that both occur simultaneously rather than consecutively as Mr. Killingsworth intimated.  Mr. Killingsworth alleges that an electric brake would prevent coast and drift and, instead, would produce an instantaneous stop.

The Defendants had a burden of proving that his design did not pass the risk-utility test; namely, that its adverse effects outweighed the likelihood that the product's actual design, which allowed coasting and drifting, would have caused Melvin's electrocution;[20] in other words, that the risk, which an electric brake would create for aerial ladder operators, far outweighed the risk that coasting or drifting of the ladder creates.

Both Mr. Faddis, a mechanical engineering expert, and Mr. Sader testified that, by design, the ladder *must* have coast and drift.  Mr. Sader said that "the stopping of a unit has to be cushioned in some fashion." Otherwise, "the operator out there would probably be whipped around pretty severely."  Mr. Faddis stated, "[b]y design, anything that you start and stop, you have to build in some kind of coasting by design. . . . it just simply makes sure that there are not any violent motions put on an operator that is out at the end of the thing."  Furthermore, Mr. Killingsworth admitted that an immediate stop could make the bucket swing over.

Thus, by Mr. Killingsworth's own admission, the likelihood that "coasting and drifting" would create an inability to avoid dangers, such as power lines, does not outweigh the adverse effect of his design, which would place the operator in danger in every instance he operated the ladder, as opposed to the current design, placing the operator in danger only when its operation is coupled with being close to some external dangerous condition.

---

[20]La.R.S. 9:2800.56(2).

Accordingly, the Defendants presented sufficient evidence to prove that the Plaintiffs would not have prevailed against Sponco on this particular issue.

Mr. Killingworth proposed a second alternative design using proximity warning devices. Electrical fields trigger alarms on such devices, and they existed at the time of the ladder's manufacture. In fact, Sponco informed purchasers of their existence and availability and left the decision up to them. However, both, Mr. Sader and Dr. John Darrell Morgan, an expert in electrical engineering and accident reconstruction within the electrical engineering field, testified that these devices were unreliable. Moreover, Dr. Morgan testified that because the devices operate by using magnetic fields, any interference within the magnetic field may distort the device's ability to detect the danger at the appropriate proximity. Additionally, he testified that there are many factors which can interfere with the magnetic field. Thus, such devices actually provided an added danger by creating a false sense of security for the operator.

Accordingly, the Defendants proved that the absence of proximity warning devices did not constitute a design defect.

Finally, the Plaintiffs presented an alternative design which insulated the ladder's bucket with fiberglass. This design existed at the time of the ladder's manufacture. In fact, Sponco manufactured another ladder at that time which incorporated the design. Sponco's IH (insulated hydraulic) series of ladders had insulated buckets. This proves that such a design was feasible and that Sponco knew of it. Furthermore, testimony revealed that this design had the capacity to prevent Melvin's accident. Specifically, Mr. Brooks testified that if the bucket were insulated, Melvin would have suffered only a light shock, even if his body made contact with the power lines. Furthermore, the Defendants presented no evidence of adverse effects of insulation on the ladder's utility nor did they provide evidence of any burden, other than higher costs, that Sponco would have incurred by incorporating the design.

Accordingly, the jury could have found that the Defendants failed to carry their burden of proving that the Plaintiffs would not have recovered against Sponco on this design defect claim.

*Dangerous in Construction or Composition*

9

"[I]f, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer," it is unreasonably dangerous in construction or composition.[21]

Plaintiffs offered the testimony of Mr. Hayes, who stated when watching Melvin work on the signs prior to the accident, he observed the ladder coast to be three to four feet. Further, Mr. Kent Langley, a Signko employee, who retrieved the ladder from the accident site, testified that he tested it and found it to be working properly. However, he also said that while the normal coast and drift of the ladder was one to two feet, it could be up to four feet, depending on how far the ladder was extended. The Plaintiffs elicited testimony from Mr. Sader, agreeing that four feet of coast would be excessive, even though Sponco has no standards delineating the amount of coast considered acceptable.

Nonetheless, the defect in construction or composition must have existed at the time the ladder left Sponco's control. Mr. Kent Johnson stated that he had done all the maintenance on this particular ladder when Kojis & Sons owned it. He serviced and inspected it on a weekly basis. When Signko bought it, he instructed Kent Langley regarding general maintenance.

Thus, there is no evidence of a defect in construction or composition at the time Sponco relinquished custody of the ladder.

However, Mr. Killingsworth testified the ladder had the capacity to coast and drift this far when it left the manufacturer because of its design and that the arrangement of the gear box allowed it to loosen progressively with each use, which, in turn, created more and more drift. He presented a couple of ways to decrease the drift but not the coast. In order to eliminate both coast and drift, he offered the alternative design of an electric brake, which we have already determined to be an unacceptable alternative design.

Accordingly, we have found one theory which provides a reasonable basis for the jury's determination that the ladder had an unreasonably dangerous

---

[21]La.R.S. 9:2800.55.

characteristic; namely, that the ladder was unreasonably dangerous in design because it was not insulated.

We turn to the second prong of the analysis, proximate cause.

*Proximate Cause*

Mr. Brooks testified that if the bucket were insulated, Melvin would have suffered only a light shock, even if his body made contact with the power lines. Accordingly, but for the failure to insulate the bucket, Melvin would not have been electrocuted.

*Intended Use*

The last prong of the analysis is that the damages must arise while employing the product in a reasonably anticipated use. Mr. Johnson testified that these types of aerial ladders dominate the sign industry. While Mr. Sader maintained that their use was broader, he acknowledged that they were commonly used in the sign industry. Additionally, there was no evidence that Melvin was operating the ladder in an inappropriate manner.

Thus, we have identified a theory which provided the jury with a reasonable basis for finding liability on Sponco's part.

**MELVIN GUIDRY'S FAULT**

Mr. Calvin Peco, who had stopped at Lucky's because his car was overheating, was the only person to see Melvin make contact with the power lines. Mr. Peco pulled his car into the parking lot to allow it to cool down and watched Melvin as he worked on the sign. Melvin brought the ladder down and both went into the store to purchase a drink and made small talk on their way out. Mr. Peco returned to his vehicle. Melvin returned to working on the signs. Mr. Peco testified that he looked up just in time to see Melvin contact the power lines, electrocuting him and throwing him to the ground just behind Mr. Peco's car.

Mr. Peco stated that the power lines struck Melvin around his right shoulder and neck area. The expert physicians testified that it was impossible to conclusively determine Melvin's entry and exit wounds. In other words, they could not determine which part of his body first made contact with the lines.

11

Thus, we do not have any evidence as to which way Melvin was looking when he struck the power lines.

However, Mr. Peco testified that Melvin was not wearing any kind of body harness or safety belt. Furthermore, the Occupational Safety and Hazards Administration (OSHA) mandates that persons, unless specially licensed to work on power lines, maintain a ten foot distance from power lines. Both Plaintiffs' and Defendants' experts confirmed that if Melvin had observed OSHA's safety rule, the accident would not have occurred. Melvin also had the responsibility of surveying the site before beginning the work to determine any potential hazards and to call Entergy to shield the lines.

## LUCKY LONGHORN'S LIABILITY

The Defendants assert that the jury erred in finding Lucky liable for Melvin's death. As we explained above, they had the burden of proving that the Plaintiffs could not have prevailed against Lucky.

In Louisiana, we employ a duty-risk analysis to determine whether a party is liable for its negligence given the particular facts of the case.[22] The analysis consists of four elements: namely, whether the defendant owed the plaintiff a duty of care; and if so, whether that duty encompassed the particular risk of harm the plaintiff suffered; whether the defendant breached that duty; and if so, whether the breach was a cause-in-fact of the plaintiff's injuries.[23]

### Duty

"Generally, the owner or operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm."[24] In the instant case, Lucky owned the property, including the signs, and its operator, Mr. Hayes, requested that Melvin do additional work once he arrived on Lucky's premises.

---

[22]*Manning v. Dillard Dep't Stores*, 99-1179 (La. 12/10/99), 753 So.2d 163.

[23]*Cormier v. Albear*, 99-1206 (La.App. 3 Cir. 2/2/00), 758 So.2d 250.

[24]*Manning*, 753 So.2d at 165.

Lucky and Mr. Hayes had a duty of not exposing Melvin to unreasonable risks of harm.

*Breach*

The jury could have reasonably found that the placement of the signs in such  close proximity to the power lines constituted a breach of that duty. However, the Defendant attorneys introduced evidence that Lucky complied with OSHA's regulations, placing the billboards a sufficient distance away from the power lines.  Mr. Frederick Brooks, Defendants' expert in electrical engineering, as well as in the National Electric Safety Code and OSHA regulations, testified that OSHA regulations at the time of the accident required a horizontal distance of 7½ feet from power lines, and Lucky's closest sign provided an 8½ feet clearance. Further, OSHA required a diagonal clearance of 8 foot, and the diagonal distance of Lucky's closest sign was 9.24 feet.

While Lucky placed the signs themselves a sufficient distance from the power lines under OSHA, the jury could have found the proximity of the signs to the power lines created an unreasonable risk of harm.  Specifically, OSHA also requires persons to maintain a ten-foot clearance from overhead power lines.  Even though Lucky positioned the signs within acceptable horizontal and diagonal distances under OSHA's rules, their proximity to the power lines made it impossible to work on one of the signs without violating OSHA's ten-foot rule. Thus, once Lucky asked Melvin to work on the signs, it created an unreasonable danger for him, because he could not work on all of them without violating OSHA's rule.

*Scope of Duty*

We must now address whether the risk of Melvin's injuries were within the contemplation of Lucky's duty.  "[T]he scope of the duty inquiry is ultimately a question of policy as to whether the particular risk falls within the scope of the

duty."[25] We must examine how easily we can associate his injuries with Lucky's conduct.[26]

Mr. Brooks admitted that the signs' placement made it impossible for an individual to work on the west side of one of the signs without violating OSHA's ten-foot rule. Moreover, Lucky knew or should have known of the close proximity because the power lines were already in position when Lucky installed the signs. Furthermore, because Lucky was aware that these signs would require periodic maintenance, it should have foreseen the risk created by placing the signs in such close proximity to the power lines. Accordingly, Lucky's duty encompassed the particular risk that someone performing maintenance work on the signs could come into contact with the power lines.

*Causation*

And finally, the jury could have found that, but for the sign's proximity to the power lines, Melvin would have avoided electrocution. Additionally, but for Mr. Hayes' request that he perform this additional work, after he arrived on the premises to work on another sign, he would not have been working on this particular pole. And, while testimony did not prove that Melvin was working on the particular sign that necessitated an OSHA violation, three signs, including that one, were located on the same pole, and Mr. Hayes had asked Melvin to work on any or all of the three that needed attention.

Thus, the jury could have reasonably found that the Defendants failed to meet their burden of producing evidence sufficient to prove that the Plaintiffs could not have prevailed against Lucky.

SIGNKO'S FAULT

Because the trial court reallocated all of the fault that the jury assigned Signko, we review whether the jury could have reasonably determined that it was at fault. Determining its fault, also, requires a review of the duty-risk analysis.

---

[25]*Roberts v. Benoit*, 605 So.2d 1032, 1044 (La.1991).

[26]*Id.*

14

*Duty*

Louisiana Workers' Compensation Law requires employers to do everything reasonably necessary to protect the life, health, safety, and welfare of its employees.[27] This includes providing proper safety devices and safeguards to render the employment safe, considering the normal hazards of such employment.[28]

*Scope*

Mr. Kojis' own testimony revealed that Signko knew power lines posed a normal hazard to its employees. He testified that it was a frequent topic of conversation among them. Thus, Signko's duty to Melvin certainly encompassed the particular risk of injury by a power line.

*Breach*

While Mr. Kojis testified that Signko employed a ten-foot rule for *installations* of new signs, he never explicitly addressed maintenance of existing signs. Furthermore, he did not describe the ten-foot requirement as a safety rule; rather, he said Entergy would require them to relocate the signs if they did not abide by the rule. He did not even know that OSHA had a ten-foot rule but thought OSHA required only a seven foot clearance. And despite Signko's duty to provide proper safeguards to ensure that Melvin's work environment would be safe, it provided him with an uninsulated ladder, even though insulated ones were available. Thus, the jury could have reasonably found that Signko breached its duty to Melvin by failing to provide him with an insulated ladder, as well as by its failure to know and, therefore, stress the importance of safety rules.

*Causation*

Certainly, Melvin's accident would not have happened but for Signko's failure to provide him with an insulated ladder, as well as Melvin's failure to place proper significance on adherence to OSHA's safety rules.

---

[27]La.R.S. 23:13.

[28]*Id.*

CAUSATION – SUBSTANTIAL FACTOR TEST

Cause-in-fact is one of the essential elements of the Plaintiffs' claim.[29] It is usually determined by using a "but for" test. In other words, if the plaintiff would not have been injured "but for" the defendant's conduct, the cause-in-fact component is met.[30]

In the above analyses, we have reviewed the "but-for" causation of the cause-in-fact inquiries. However, when there is more than one action that, allegedly, precipitated an accident, our courts have fashioned a method that is more effective than the "but for" test in establishing cause-in-fact.[31] This method is often referred to as the "substantial factor test."[32]

We find a reasonable basis for the jury's determinations that Lucky's actions, Melvin's actions, Signko's actions, and Sponco's failure to incorporate an insulated bucket into the ladder's design were all substantial factors in Melvin's accident. Specifically, Lucky placed the signs in a dangerously close proximity to the power lines; Lucky's operator asked Melvin to work on those particular signs after he arrived on site; Melvin violated OSHA's ten-foot rule and failed to use a safety harness or seat belt, or request that Entergy shield the lines to make them safe; OSHA held Signko responsible for Melvin's OSHA violation, and Signko provided Melvin with an uninsulated ladder to perform his job, despite the availability of insulated ones; and, finally, Sponco manufactured an uninsulated ladder even though, as its president admitted, aerial ladders dominate the sign industry, and are, therefore, likely to be operated at heights equivalent to power lines.

FAULT ALLOCATION

Allocating fault requires factual determinations. "As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Therefore, an appellate court should only disturb the trier of fact's

---

[29]*Perkins v. Entergy Corp.*, 00-1372 (La. 3/23/01), 782 So.2d 606.

[30]*Boykin v. Louisiana Transit Co.*, 96-1932 (La. 3/4/98), 707 So.2d 1225.

[31]*Perkins,* 782 So.2d 606.

[32]*Id.*

allocation of fault when it is clearly wrong or manifestly erroneous."[33]   In testing the jury's allocation for manifest error, we look to the same factors that guided its determination.  Our supreme court enumerated these factors in *Watson v. State Farm Fire and Casualty Insurance Company*:[34]

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger,
>
> (2) how great a risk was created by the conduct,
>
> (3) the significance of what was sought by the conduct,
>
> (4) the capacities of the actor, whether superior or inferior, and
>
> (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought.  And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

The jury assessed the majority of the fault to Melvin and his employer, Signko.  It allocated twenty percent to Lucky and a mere five percent to Sponco. Melvin was a very experienced sign worker.  In fact, Mr. Kojis testified that he was one of the most experienced at Signko.  Melvin had ample experience with this particular ladder.  In his deposition, Mr. Hayes admitted that Melvin mentioned to him that he was going to have to be careful of those power lines. Thus, Melvin demonstrated an awareness of the danger.  The risk created by violating the 10-foot rule was grave, and, in fact, proved to be fatal.  Mr. Langley testified that Melvin knew of the ten-foot rule and that he also knew that he had the option of calling Entergy to come shield the lines.  In fact, Mr. Brooks said that OSHA required him to contact Entergy.  Additionally, Melvin was in a superior position to the other parties in his ability to avoid the accident and certainly only, he, had the last clear chance to avoid electrocution.

Further, OSHA held Signko responsible for Melvin's violation.  Moreover, Mr. Brooks confirmed that "the responsibility for OSHA Regulations or workplace safety regulations lie with the employer, the person that is sending people out on

---

[33]*Duncan v. Kansas City S. Ry. Co.*, 00-66, pp. 10-11 (La. 10/30/00), 773 So.2d 670, 680 (citations omitted).

[34]469 So.2d 967, 974 (La.1985).

the job, and also the employees, both." Again, Signko was aware of the danger power lines presented to the employees, yet it was uncertain of the clearance distance that OSHA required. It also ascribed its internal ten-foot installation rule to efficiency, more so than safety; Mr. Kojis stated that Entergy would require them to relocate the signs if they did not abide by the rule. And Signko provided Melvin with an uninsulated ladder even though insulated ones were available.

The jury assessed Sponco with only five percent of the fault for Melvin's accident. Sponco manufactured both insulated and uninsulated ladders since around 1980. Mr. Sader testified that while the SL-55 ladders were used in the sign industry, their potential uses were much broader. The jury could have found that Sponco's customer is in the best position to know its own needs because only the customer knows the environment and circumstances under which it intends to operate the equipment. Accordingly, the customer is in the best position to know how often external dangers, such as power lines, will pose a threat. And, again, in the instant case, Mr. Kojis' testimony that it was a frequent topic of conversation demonstrates Signko's awareness that power lines presented a significant risk to its employees, given the type of work Signko does. Thus, the jury could have found that Signko was in a superior position to know the type of equipment Melvin needed to do his job safely and, therefore, should bear the majority of the responsibility for the fact that Melvin's ladder was uninsulated. Ultimately, Signko had the responsibility to provide Melvin with the proper equipment. Further, Sponco provided manuals and decals on the ladder which warned that it was not to be used within ten feet of energized power lines.

And, finally, the jury assessed twenty percent of the fault to Lucky. We find no manifest error in this determination. Lucky placed the signs in a proximity to the power lines that required Melvin to violate OSHA's ten-foot rule in order to work on them. Mr. Hayes asked Melvin to work on these particular signs after he arrived at the site to work on a different area. Furthermore, Mr. Hayes' deposition testimony revealed that Melvin had brought Mr. Hayes' attention to the fact that the power lines were close to the signs.

Accordingly, we find no manifest error in the jury's fault allocation.

**JUDGMENT NOTWITHSTANDING THE VERDICT**

18

When the jury is the factfinder, the standard for overturning its verdict is a rigorous one. A Judgment Notwithstanding the Verdict (JNOV) is warranted, only, when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The trial court may not grant a JNOV if there is contradictory evidence which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. The trial court should not evaluate witnesses' credibility in deciding whether to grant a JNOV, and it must resolve all inferences or factual questions in favor of the non-moving party.[35]

We review the trial court's grant of JNOV by using the same criterion that governs its decision. If reasonable persons might have reached the same verdict as the jury, we should reinstate its verdict.[36]

Because we have already determined that the record reasonably supports the jury's determination, we vacate the trial court's JNOV and reinstate the jury's verdict.

**ADMISSIBILITY OF EXPERT TESTIMONY**

Louisiana Code of Evidence Article 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[37] the United States Supreme Court held that trial courts must act as gatekeepers by determining that expert testimony is not only relevant but, also, reliable before admitting it.

---

[35]*VaSalle v. Wal-Mart Stores, Inc.*, 01-462 (La. 11/28/01), 801 So.2d 331.

[36]*Id.*

[37]509 U.S. 579, 113 S.Ct. 2786 (1993).

Louisiana adopted this holding in *State v. Foret.*[38]  *Daubert* suggested several factors to aid the court in determining whether expert testimony is reliable, including whether the expert's theory is testable, has been peer reviewed or a subject of publication, its known or potential rate of error, and its degree of acceptance within the scientific community.[39]

*Stephen Killingsworth*

The Defendants objected to the admission of Mr. Killingsworth's testimony regarding his alternative design to include an electric brake on the ladder.  They argued that this testimony did not meet the *Daubert*/*Foret* tests.  However, both *Foret,* as well as the United States Supreme Court's opinion in *Khumo Tire Co. v. Carmichael,*[40] reinforced that a court *may* use the suggested factors if it will aid in the reliability determination, but the reliability test is a flexible one.  We find no abuse of discretion in the trial court's decision to admit this testimony.

Mr. Killingsworth provided instructive and informative testimony to help the jury understand the aerial ladder's components and mechanical functions.  His proposed design had already been incorporated into similar devices; namely, cranes.  He explained that because of the similarity in the components and mechanics of the two devices, the brake's incorporation into cranes demonstrated the feasibility of its incorporation into aerial ladders.  Even the Defendant's expert admitted that adding a brake was a feasible design.  Ultimately, the Defendants proved that the primary purpose of each device, one to carry humans and the other to carry cargo, was a critical factor that caused the adverse effects of such a design in the aerial ladder to outweigh its utility.  However, this factual inquiry was properly submitted to the jury.  The trial court did not abuse its discretion by admitting Mr. Killingsworth's testimony.

*James Sobek*

The trial court qualified Plaintiffs' witness, Mr. James Sobek, as an expert physicist and professional engineer with a specialty in human vision.  Mr. Sobek

---

[38] 628 So.2d 1116 (La.1993).

[39] *Daubert*, 509 U.S. 570

[40] 526 U.S. 137, 119 S.Ct. 1167 (1999).

explained that a person viewing horizontal power lines against a clear sky cannot accurately perceive his distance from them because of a principle called stereopsis. He offered an article that had been published on the subject, "Problems and Perception of Overhead Power Lines," showing that the theory had been tested and discussed the known potential rate of errors. Thus, the trial court did not abuse its discretion in finding Mr. Sobek's testimony reliable.

Defendants further argue that Mr. Sobek's testimony is irrelevant because it assumes that Melvin was looking toward the power lines just before he struck them, and they point out that no witness testified that he was actually looking in this direction. Nonetheless, the expert testimony shed light on a factual issue and was properly presented to the jury.

Accordingly, we find no merit to Defendants' arguments. The trial court did not abuse its discretion in admitting Mr. Sobek's testimony.

**EXPERT WITNESS FEES**

The trial court has broad discretion to award and assess costs, and we will not disturb its ruling absent an abuse of discretion.[41] The degree to which the expert's opinion aided the court in its decision is one of the factors to consider when assessing costs of an expert witness' fee.[42] The Defendants urge that they should not have to pay Killingsworth's and Sobek's fees because their testimony should have been inadmissible. As we have already determined that the trial court properly admitted their testimony, we find no error in its assessing their respective fees to the Defendants.

**MEDICAL AND FUNERAL EXPENSES**

The Defendants argue that the trial court erroneously awarded the Plaintiffs $25,250.00, which Signko's workers' compensation carrier had already paid. Specifically, it paid $16,250.00 in medical expenses and $9,000.00 in funeral expenses.

---

[41]*Id.*

[42]*Trans Louisiana Gas Co. v. Heard*, 629 So.2d 500 (La.App. 3 Cir. 1993).

However, the collateral source rule does not allow the two Defendants to benefit from the workers' compensation carrier's payments. If a plaintiff receives benefits from a source independent of the tortfeasor, the benefits inure to the plaintiff, not to the tortfeasor.[43] In other words, if the independent source, here, the workers' compensation carrier, does not intervene to recoup the benefits it already paid, the plaintiff may recover the amount of the benefits from the tortfeasor.

The Defendants argue that the collateral source rule does not apply in the instant case because they are not the tortfeasors in the underlying suit. Nonetheless, Lucky and Sponco, the two liable parties in the underlying suit, could not have benefitted from the workers' compensation carrier's payments. Accordingly, the Defendants cannot claim the benefit either.

The Defendants argue that *Gagnard v. Baldrige*[44] stands for the proposition that the plaintiffs may not get a double recovery in cases such as the instant one. However, *Gagnard* is inapplicable. In that case, the plaintiff brought actions against the employer, both, in workers' compensation and in tort. The court stated that "[a] *wrongdoer* should not be required to pay twice for the same elements of damages."[45] In the instant case, neither the Defendant attorney wrongdoers nor Lucky or Sponco, the wrongdoers in the underlying action, is being required to pay twice for the same element of damages. Rather, the collateral source rule is applicable. Thus, we find no error in the trial court's ruling.

**RANDI GUIDRY**

The Defendants appeal the trial court's finding that Randi Guidry is a proper party to recover wrongful death and survival damages. Louisiana Civil Code Article 2315 delineates the classes of persons who may recover for these damages. The first is "[t]he surviving spouse and child or children of the deceased, or either

---

[43]*Taylor v. Premier Ins. Co. of Massachusetts,* 98-1934 (La.App. 3 Cir. 6/30/99), 742 So.2d 35.

[44]612 So.2d 732 (La.1993).

[45]*Id*. at 736 (emphasis added).

the spouse or the child or children."[46]  Before trial, the parties stipulated that Randi was Melvin's daughter.  The Defendants apparently made this stipulation based on Julie's deposition testimony.  However, at trial, testimony revealed that she was not Melvin's biological daughter, notwithstanding his signature on her birth certificate as well as his execution of an Act of Acknowledgment of Paternity. The Defendants argue that because no formal adoption took place, Randi cannot recover as Melvin's daughter.

The trial court found that Randi could recover:

> The *Rousseve* court explained that the acknowledgment - - - when the acknowledged fact is ultimately untrue, the acknowledgment - - - and the Court is impressed with the word "may be null" absent some overriding concern of public policy, indicating to this Court that it is not necessarily an absolute nullity but must be reviewed under the circumstances surrounding the specific case that is before it.
>
> . . . .
>
> In *Lehr vs. Robertson* 463 U.S. 248 the U.S. Supreme Court observed that intangible fibers that connect parent and child have infinite variety, and are woven throughout the fabric of our society providing it with strength, beauty, and flexibility.  The rights of parents have long been recognized as a counterpart of the responsibilities they have assumed.  Justice Stewart noted in his ascending [sic] opinion in *Caban vs. Mohammad*, 441 U.S. 380 that parental rights do not spring full blown from biological connection between parent and child. They require relationships more enduring. Moreover, it is the actual relationship which demonstrates a commitment to the responsibilities of parenthood, and has been the focal point in seeking to determine the rights and protections which should be afforded to natural fathers.
>
> . . . .
>
> The court notes, and based on the evidence that was heard at the jury trial, that there was no doubt that Mr. Guidry spent significant time with Randi, treated her no doubt as his daughter, raised her involved in extra-curricular sports and activities.

---

[46]La.Civ.Code art. 2315.1; La.Civ.Code art. 2315.2.

23

Nonetheless, the trial court did not have the benefit of our supreme court's latest pronouncement on this issue. In *Turner v. Busby*,[47] a decision rendered after the trial court's ruling, a divided supreme court held that "an Article 203 formal acknowledgment absent a biological relationship is a nullity."[48] In this instance, Melvin's acknowledgment by signing Randi's birth certificate and his execution of an Act of Acknowledgment of Paternity are both forms of an Article 203 formal acknowledgment. Given Randi's and Julie's admissions that Melvin had no biological relationship to Randi, we must find that his acknowledgment is a nullity. Accordingly, we are compelled to reverse the trial court's ruling. Randi may not recover wrongful death and survival damages for Melvin's death. Thus, we reverse the $70,000.00 in damages awarded to Randi Guidry.

## QUANTUM OF DAMAGES

### *Loss of Support*

The jury awarded the Plaintiffs $350,000.00 for Melvin's past wages and loss of earning capacity. Both Plaintiffs and Defendants presented expert testimony regarding this element of damages. Plaintiffs' expert included fringe benefits, as well as a significant salary increase, which he based on Mr. Kojis' testimony that had Melvin stayed with Signko, he would have received these benefits. Defendants' expert used Melvin's past income tax returns and did not include the added benefits because Melvin was not receiving them at the time of his death. He found it to be unlikely that Melvin would have worked at Signko until retirement, given that Melvin had worked for other sign companies in the past and the high turnover rate in the business, generally.

The jury did not award the exact figure that either expert calculated. Nevertheless, it is permitted to "substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole."[49] "Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. A fact-finder may accept or reject the

---

[47]03-3444 (La. 9/9/2004), 883 So.2d 412.

[48]*Id.* at 419.

[49]*Green v. K-Mart Corp.*, 03-2495, p. 5 (La. 5/25/04), 874 So.2d 838, 843.

24

opinion expressed by an expert, in whole or in part."[50]  Thus, we find no error in the jury's determination.

*Pre-Death Pain and Suffering*

The jury found the Plaintiffs were entitled to $10,000.00 for Melvin's pre-death pain and suffering.  It has vast discretion in assessing damages.  We may find that it abused this discretion, only, if its award is so low in proportion to the injury that it shocks our conscience.[51]  Indeed, we so find in the instant case.  Mr. Hayes, who came out of the store immediately after the accident, testified:

> A.  When I come out I seen him laying on the ground.  There was a couple of people around him.  I seen smoke coming off his shirt, and I run over to see if I could help in any way.  There was another fellow there trying to do a little CPR on him.  He was making a lot of moaning sounds, and they asked me to help hold him down and not let him move. At that time they weren't sure, you know, I wasn't sure what had happened.  The basket was still up in the air.  So, I assumed he had had a pretty good fall and that is the reason they wanted me to hold him down, you know.  So, two of us held him there waiting for the ambulance to get there.
>
> Q.  You had to actually physically hold him down?
>
> A. Yes, sir.
>
> Q.  Did you take off his shirt?
>
> A.  No, not just myself.  A few people that were there just – it was smoldering, so we wanted it off of him.
>
> Q.  And when you took off his shirt you actually burned your hands?
>
> A. Yes, sir.
>
> Q.  And you said he was making noises.  It appeared that he was in pain?
>
> A.  Yes, sir.

Dr. Ledet testified that by the time Melvin reached the emergency room, he had lost consciousness.  While we do not know the duration of Melvin's

---

[50]*Id.* at 843.

[51]*Young v. Fitzpatrick*, 03-1038 (La.App. 3 Cir. 2/4/04), 865 So.2d 969.

consciousness, the above testimony reveals that he did have awareness immediately following the accident.

The Plaintiffs cite *Strawder v. Zapata Haynie Corp.*[52] in which the decedents drowned twenty to thirty minutes after an explosion which caused severe burning and blistering. This court upheld an award of $500,000.00 for pre-death pain and suffering. Additionally, in *Cox v. Moore*, this court upheld a $150,000.00 award for pre-death pain and suffering where the decedent died only a few minutes or almost instantaneously after a car accident. While we found the award to be on the high end of the spectrum, it was not an abuse of discretion.

Accordingly, we find $75,000.00 to be the lowest reasonable amount for Melvin's pre-death pain and suffering. Therefore, we increase the jury's assessment to that amount.

*Mental Anguish from Malpractice*

The jury awarded $30,000.00 for mental anguish arising from the Defendants'

malpractice. Again, the jury has vast discretion in assessing damages. We do not find that $30,000.00 is abusively low. Thus, we affirm this quantum.

## CONCLUSION

Accordingly, we vacate the trial court's JNOV, reinstate the jury's verdict, amend its judgment to increase the quantum of damages for pain and suffering and render. We, also, reverse the trial court's $70,000.00 award to Randi Guidry. We cast all costs of this appeal on the Defendants.

**AFFIRMED IN PART AS AMENDED, REVERSED IN PART, AND RENDERED.**

---

[52] 94-453 (La.App. 3 Cir. 11/2/94), 649 So.2d 554.

NUMBER 04-325

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

JULIE GUIDRY, ET AL.

    Plaintiffs - Appellants

Versus

COREGIS INSURANCE COMPANY, ET AL.

    Defendants - Appellants

On appeal from the Fourteenth Judicial District Court [No.98-4848], for the Parish of Calcasieu, State of Louisiana; the Honorable G. Michael Canaday, District Judge, presiding.

Woodard, J., concurring, in part.

Given the uncertainty of how our supreme court would view the unusual circumstances in the instant case under the light of its *Turner v. Busby*[1] opinion, I am constrained to vote with the majority regarding Randi Guidry's legal status in her family. Namely, *Turner* addressed the rights of acknowledged illegitimate children, who are not biological children but did not, specifically, address how legitimated children in the same circumstances are to be treated. In fact, it intimated that perhaps its conclusion, that acknowledged illegitimate children could not recover wrongful death and survival damages under La.R.S. 2315.1 and 2315.2, would be different for legitimated children, as in Randi's situation.

Louisiana law classifies children as either legitimate, illegitimate, or legitimated.[2] Louisiana Civil Code provides methods for, both, formally acknowledging illegitimate children and for legitimating illegitimate children. Formal acknowledgment and legitimation are separate and distinct acts with different

---

[1]03-3444 (La. 9/9/2004), 883 So.2d 412.

[2]*Id.*

effects and benefits flowing from each. Most importantly, legitimated children enjoy an added layer of protection from those who wish to attack the parent/child relationship. Specifically, the Civil Code explicitly permits, only, the father or if he is deceased, his heirs or legatees to seek to disavow a *legitimate* child's paternity.[3] Conversely, La.Civ.Code art. 207 provides that "[e]very claim, set up by *illegitimate* children, may be contested by *those who have any interest* therein." (Emphasis added).

In *Turner,* La.Civ.Code art. 207 permitted the defendants to attack McWright's claim because he was a formally acknowledged, *illegitimate* child. When he sought to prove that he was a proper party to recover wrongful death damages because the deceased had executed multiple acknowledgments of paternity for child support purposes, the defendants contested the existence of a biological relationship and argued that the acknowledgments were insufficient to elevate his status to a "child" for wrongful death purposes. Ultimately, DNA tests proved that no biological relationship, in fact, existed, and the supreme court deemed the formal acknowledgment to be a nullity because of this.

Before *Turner*, our jurisprudence, governing formal acknowledgments, held that "[w]hen the acknowledged fact is ultimately untrue, the acknowledgment *may* be null, *absent some overriding concern of public policy*."[4] This permitted courts some discretion. However, essentially, the supreme court's decision in *Turner* deletes the italicized language of prior jurisprudence, finding that "an Article 203 formal acknowledgment absent a biological relationship *is* a nullity."[5] (Emphasis added.)

Notwithstanding, the court highlighted the distinction between a formally acknowledged illegitimate child and a legitimated child. It concluded that the acknowledgment of paternity, at issue, lacked a *declaration of intent to legitimate* McWright, and "[w]ithout *this* declaration, the execution of the . . . stipulation did not legitimize McWright. Because McWright *was not a legitimate child* at the time this wrongful death and survival action commenced, *but rather a formally acknowledged illegitimated child* under Article 203, his claim *as an illegitimate child* may be subject

---

[3]La.Civ.Code art. 187; La.Civ.Code art. 190.

[4]*Rousseve v. Jones*, 97-1149, p.7 (La. 12/2/97), 704 So.2d 229, 233.

[5]*Turner*, 883 So.2d 412.

to scrutiny provided the defendants have probed all other requirements of Article 207."[6] (Emphasis added.)

This statement contemplates the possibility that, despite the absence of a biological relationship between him and the child, the deceased could have legitimated McWright, thereby, permitting his recovery of wrongful death benefits, if the deceased had declared his intention to do so.

Indeed, if the supreme court intended this distinction, it appears to contradict other portions of its *Turner* opinion which emphasize that a biological relationship is necessary for recovery. In support of its decision, the supreme court stressed that it is the biological relationship, rather than the legal status, which is determinative of whether a person is entitled to recover these damages. It specifically stated, "it is imperative that we uphold the critical requirement that the tort victim and the child have a biological relationship." Consequently, the opinion gives us conflicting guidance in resolving Randi's right to recover, particularly, when meshed with legislative dictates.

For example, the *Turner* opinion's prohibition on a child's recovery, based on no biological relationship, is inconsistent with our Civil Code which does not create classifications of biological versus non-biological children but rather, only, legitimate versus illegitimate children. The Code clearly contemplates the possibility that a child could prove legitimate filiation and receive the attendant benefits of this classification without having a biological relationship.

Louisiana Civil Code arts. 193 through 197 provide that a party can prove legitimation through, *inter alia,* "a transcript from the register of birth or baptism" or by *reputation*. Article 195 states, in pertinent part:

> The being considered in this capacity is proved by a sufficient collection of facts demonstrating the connection of filiation and paternity which exists between an individual and the family to which he belongs.
>
> The most material of these facts are:
>
> That such individual has always been called by the surname of the father from whom he *pretends* to be born; . . . .

---

[6]*Id.* at 418.

(Emphasis added.) This language implicitly recognizes that legitimated children are not necessarily biological children. Moreover, none of the methods of legitimating a child require proof of a biological relationship.

The method Melvin chose to legitimate Randi is that provided in La.Civ.Code art. 198:

> Illegitimate children are legitimated by the subsequent marriage of their father and mother, whenever the latter have formally or informally acknowledged them as their children, either before or after the marriage.

Melvin had elevated Randi's status to that of a "legitimated child" under all of the relevant codal provisions. By the time of the wrongful death suit, not only had he formally acknowledged her as his daughter through an Act of Acknowledgment of Paternity but, also, he had signed her birth certificate as her father and, subsequently, married her mother. Furthermore, she was his daughter by reputation. All of these affirmative acts, evidencing his intent, should provide her with an added layer of protection against attacks from third-party defendants, regarding her familial status.

Nevertheless, the dilemma for Randi is two-fold: She is not Melvin's biological child and the method Melvin chose to legitimate her is premised, in part, on an acknowledgment which, alone, the supreme court considers null absent a biological relationship. The unanswered question is whether this nullity can be cured and, if so, whether Melvin cured it by taking the next step of legitimating Randi.

Furthermore, there is an issue of whether the third-party Defendants, even, have standing to contest Randi's claim, given La.Civ.Code arts. 187 and 190. Essentially, these articles imbue, only, the "father" or his heirs with standing to strip a "child" of his or her legitimate status, which, in essence, is the foundation of these third-party defendants' claims in the instant case.

Given the apparent legislative intent, as well as Melvin's, it certainly does not seem appropriate or prudent for *Turner*'s umbrella to be held over Randi's head, denying her benefits for the loss of the man she knew to be and treated as her father.

4